**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**DALE A. DIMARCO,**

      **Plaintiff,**

**v.**                                    **Case No.  8:04-cv-1405-T-TBM**

**JO ANNE B. BARNHART,**
**Commissioner of the United States**
**Social Security Administration,**

      **Defendant.**

_____/

**O R D E R**

      The Plaintiff seeks judicial review of the denial of her claim for Supplemental Security Income payments.  For the reasons set out herein, the decision is affirmed.

**I.**

      Plaintiff was forty-seven years of age at the time of her first administrative hearing.  She stands 5', 3" tall and at that time weighed about 238 pounds.  Plaintiff has a high school education but no past relevant work.  Plaintiff applied for Supplemental Security Income payments in July 2001, alleging disability as of July 6, 2001, by reason of obesity, asthma, lung cancer, high blood pressure, shortness of breath, fatigue, and pain in her back and shoulders.  The Plaintiff's application was denied originally and on reconsideration.

      The Plaintiff then received a *de novo* hearing before an Administrative Law Judge (hereinafter "ALJ") on February 3, 2004.  In essence, Plaintiff claimed that she could no longer work at any job due to her pain, anxiety, and depression.  According to her, she is

unable to concentrate or stay focused.  Plaintiff testified that she filed her application for benefits shortly before undergoing surgery for cancer in her lung.  She indicated that after her left lower lung was removed, her recovery period extended well over a year.  She described her symptoms during the period as fatigue, pain, shortness of breath, and an inability to lift anything without pain in her arms and shoulders.  At the time of her hearing, she indicated that she had continuing problems with asthma and shortness of breath and had developed depression and anxiety.  By her testimony, she takes medication for her asthma and depression.  Plaintiff claimed that she suffered arthritic pain in her low back and hips and that her legs go numb, and that she also has pain in her shoulders.  She also takes arthritis medication.

At this hearing, Plaintiff testified that she could stand for thirty or forty minutes and sit for about the same length of time before pain would set in.  She estimated that if she was able to alternate between sitting and standing, she could last one to two hours before she would have to lie down.  Plaintiff claimed that she could lift ten to twelve pounds.  Plaintiff indicated that she could walk no more than twenty to thirty feet before suffering shortness of breath.  Plaintiff also claimed allergies that resulted in sinusitis, bronchitis, and colds.

Plaintiff described her daily activity as rising from bed, showering, dressing herself and her son, and then returning to bed for two to three hours.  By her description, she does what needs to be done, such as laundry, caring for her son, and cooking, but she lies down in between these activities throughout the day.  By her testimony, she does not visit friends or relatives often, only occasionally going out to eat or see a movie, but she does read.  See Plaintiff's testimony (R. 385-94).

2

By his decision of April 25, 2003, the ALJ determined that Plaintiff was capable of a full range of light work, and by application of the Medical-Vocational Guidelines, not disabled.  See (R. 54-61).  Thereafter, the Appeals Council granted Plaintiff's request for review and directed a remand for further consideration of Plaintiff's impairments, including further evaluation of her reported mental impairments.  The Appeals Council directed that the ALJ obtain additional evidence concerning Plaintiff's depression and anxiety and that he obtain evidence from a vocational expert to clarify the effects of any assessed limitations on the claimant's occupational base.  See (R. 79-80).

The Plaintiff then received a second hearing before the ALJ on December 1, 2003. Plaintiff testified that since her initial hearing, she continued to suffer from anxiety attacks and depression.  According to her testimony, she sometimes experienced anxiety two or three times a day and became "antsy."  If she was out and felt an attack coming on, she would return home.  If she was at home and she suffered an attack, she would lie down and sleep. Plaintiff testified her depression made her anxious and moody, and she feels depressed to the point where she cannot do anything because she cannot concentrate, and she has no energy. The medication that she takes has caused her weight to balloon to 285 pounds.

Plaintiff described a similar daily routine of getting her son off to school, doing what she needed to do, and then lying down.  According to Plaintiff, she listens to news in the morning, occasionally shops, or visits with friends.  She does not attend church because she becomes anxious around so many people.  She occasionally helps her son with homework.

Plaintiff indicated that her breathing has become deeper and harder.  She takes asthma medication often, and it does help.

In Plaintiff's opinion, she would be unable to hold any kind of job, regardless of the accommodation, because she suffers constant pain in her shoulders, back, and legs, and her constant fighting of the pain leaves her with no energy.  She then indicated that she cannot sit or stand for any lengthy period of time and occasionally has problems grasping things.  See Plaintiff's testimony (R. 399-403).

The ALJ next took testimony from a medical expert, Dr. Owen Linder, who testified that from his review of the medical record, Plaintiff was status post lung cancer and re-section, and suffered from asthma, anxiety, depression, obesity, and sinusitis.  The doctor noted that the medical records mentioned hypertension, allergic rhinitis, GERD, and arthritis with multiple arthralgias, including low back pain.  While the medical records did not support that any of the conditions met or equaled any listed impairment, the doctor opined that Plaintiff would suffer functional limitations from the various impairments.  Thus, he described that pulmonary function tests revealed "moderately severely impaired FEV1 and FEC."  In the doctor's opinion, Plaintiff could not perform heavy or medium exertional work. He opined, however, that he saw no impairment that would prevent Plaintiff from lifting twenty pounds occasionally and ten pounds frequently.

From the doctor's review of the record, Plaintiff was a caretaker for her child, her husband, and her mother.  Given the nature of her child's disability, he described the care of the child to be a full-time job.[1]  In his view, anxiety and depression were natural feelings

---

[1]In describing her daily care for her fifteen-year-old child, Plaintiff indicates that she will wake him, dress him, feed him, and make sure that he takes his medication.  According to the Plaintiff, she spends as much time with him as she can trying to teach him about daily living and life in hopes that he may reach a point where he can care for himself.  He attends a special school because of his autism.  When he has fits of outrage, she is the only one who can calm him.  He leaves for school at 5:30 a.m. and returns at 3 p.m.  See (R. 411-12).

resulting from her situation.  He opined that despite her difficult circumstances, Plaintiff had

not withdrawn to a "marked" level in terms of her activities of daily living, nor was she "non-

functioning" in social activity.  When asked whether he would defer to the mental health

evaluation by Dr. Dinwoodie, M.D., the medical expert noted that she had not had much

record to deal with, but he did not dispute her assessment.  The medical expert also noted that

because of obesity, Plaintiff would be unable to climb stairs without becoming short of breath

and would need to work in a one-story environment.  <u>See</u> Medical Expert's testimony

(R. 403-16).

Finally, the ALJ took testimony from Gerald Willi, a vocational expert (hereinafter

"VE"), who testified upon an assumption of a person Plaintiff's age, with Plaintiff's education

and past work activity, who was capable of lifting and carrying twenty pounds occasionally

and ten pounds frequently; standing, walking, and sitting for six hours out of an eight-hour

day with an unlimited ability to push and pull with all extremities; with occasional postural

limitations; with no manipulative or visual limitations; but should avoid extreme temperatures

and concentrated exposures to fumes, odors, dust, and gases.  On this assumption, the VE

testified that such limitations would allow for unskilled work as a cashier II, a sales attendant,

and a sewing machine operator.  Assuming only mild mental limitations related to activities

of daily living and maintaining social functioning and only moderate difficulties maintaining

concentration, persistence, and pace, the VE testified that Plaintiff could perform these jobs.

Upon questioning from Plaintiff's counsel, which assumed that the hypothetical individual

---

Regarding her husband, she indicates that he is unable to care for himself and is mentally
incapable of making decisions and is of no assistance in caring for their son.  She also cares
for her mother, who remains distraught over the loss of her husband.  <u>Id.</u> at 412.

would need to take unscheduled breaks several times a week to accommodate dizziness, chest pressure, and shortness of breath, the VE opined whether such breaks were tolerated would depend on the individual employer, and it would likely depend on how often such breaks occurred and how long they lasted.  Nonetheless, the witness opined that unscheduled breaks are not generally tolerated at the lower, entry-level jobs.  See VE's testimony (R. 416-21).

Also before the ALJ were medical records outlining the Plaintiff's medical history. These matters are addressed adequately by the parties' memoranda and are addressed herein as necessary.

By his decision of January 9, 2004, the ALJ determined that while Plaintiff has severe impairments related to headaches, shortness of breath, chest pain, a history of lung cancer with surgery, asthma, chronic obstructive pulmonary disease, chronic pleuritis, chronic upper respiratory infections, rhinosinusitis/allergies, hypertension, gastritis, GERD, fatigue, arthritis, arthralgias, lower back pain, obesity, and depression/anxiety, she nonetheless had the residual functional capacity to perform almost a full range of light work activities.  Upon this finding and the testimony of the VE, the ALJ concluded that Plaintiff could perform jobs available to her in the local and national economy.  Upon this conclusion, the Plaintiff was determined to be not disabled.  (R. 14-24).  The Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner.


II.

In order to be entitled to Supplemental Security Income payments, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last

6

for a continuous period of not less than 12 months. . . ."  42 U.S.C. § 423(d)(1)(A).  A

"physical or mental impairment," under the terms of the Act, is one that "results from

anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).

A determination by the Commissioner that a claimant is not disabled must be upheld

if it is supported by substantial evidence and comports with applicable legal standards.  See

id. at § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971)

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Miles v. Chater, 84 F.3d

1397, 1400 (11th Cir. 1996).  The Commissioner must apply the correct law and demonstrate

that she has done so.  While the court reviews the Commissioner's decision with deference to

the factual findings, no such deference is given to the legal conclusions.  Keeton v. Dep't of

Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994) (citing Cornelius v. Sullivan,

936 F.2d 1143, 1145 (11th Cir. 1991)).

It is, moreover, the function of the Commissioner, and not the courts, to resolve

conflicts in the evidence and to assess the credibility of the witnesses.  Grant v. Richardson,

445 F.2d 656 (5th Cir. 1971).  Similarly, it is the responsibility of the Commissioner to draw

inferences from the evidence, and those inferences are not to be overturned if they are

supported by substantial evidence.  Celebrezze v. O'Brient, 323 F.2d 989 (5th Cir. 1963).

Therefore, in determining whether the Commissioner's decision is supported by substantial

evidence, the court is not to re-weigh the evidence, but is limited to determining whether the

record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that

the claimant is not disabled.  <u>Miles</u>, 84 F.3d at 1400; <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233

(11th Cir. 1983).

The scope of review is limited to determining whether the findings of the

Commissioner are supported by substantial evidence and whether the correct legal standards

were applied.  <u>McRoberts v. Bowen</u>, 841 F.2d 1077, 1080 (11th Cir. 1988); <u>Boyd v. Heckler</u>,

704 F.2d 1207, 1209 (11th Cir. 1983).


III.

The Plaintiff raises two claims on this appeal.  As stated by the Plaintiff, they are as

follows:

(1) The Commissioner erred in failing to give proper or adequate weight to the

learned opinions of the Plaintiff's psychiatric medical sources; and

(2) The Commissioner erred in failing to fully credit the testimony of the Plaintiff

without sufficient cause.

By her first claim, Plaintiff complains that the ALJ gave inordinate weight to the

opinions of Dr. Linder, the medical expert, and inappropriately discounted the opinions of

treating sources Rosa Gardner, Psy.D., and Swapna Mukherjea, M.D.  In particular, Plaintiff

complains that Drs. Gardner and Mukherjea were treating sources, not examining sources as

determined by the ALJ, and, in any event, Dr. Linder, upon whom the ALJ evidenced great

reliance, was neither a treating or examining source and did not possess a psychiatric or

8

psychological specialty.  By Plaintiff's argument, a fair reading of the notes and opinions of

Drs. Gardner and Mukherjea demonstrate that she is disabled.[2]

      The mental health record before the ALJ was sparse.  Prior to August 2003, it

consisted of a consultative evaluation in 2001 and the assessments of nonexamining state

agency doctors.[3]  On August 7, 2003, a date well after Plaintiff's alleged onset date, Dr.

Gardner conducted a psychosocial assessment of the Plaintiff.  Plaintiff had self-referred to

Mental Health Care, Inc., and was complaining of feeling overwhelmed and stressed out

about having to care full-time for her child and her husband.  Dr. Gardner found Plaintiff

alert, oriented, of average intelligence, with good insight and judgment.  By her assessment,

Plaintiff  suffered from mixed anxiety, depression, and was very overwhelmed at having to

care for her husband and her son.  Dr. Gardner's provisional diagnosis was adjustment

disorder with mixed anxiety and depressed mood.  She assessed Plaintiff with a GAF score of

---

[2]Unfortunately, Plaintiff does not specify which opinions of these doctors are at issue. I have considered the reports thoroughly and given Plaintiff the full benefit of any doubts as to the "opinions" she may be addressing.

[3]In October 2001, Fred L. Alberts, Jr., a psychologist, performed a consultative evaluation. By his assessment, the Plaintiff was anxious and depressed, but her thought processes were logical and coherent with no preoccupations, delusions, or compulsions and she evidenced no unusual perceptual experience or paranoid mentation.  Plaintiff was oriented in all spheres and her attention and concentration appeared to be within normal limits. According to this doctor she suffered from depressive disorder, not otherwise specified. (R. 178-81).  The record also contains a mental residual functional capacity ("mental RFC") assessment and Psychiatric Review Technique ("PRT") form completed in November 2001 by reviewing doctor, Arthur H. Hamlin, Psy.D.  That doctor opined Plaintiff suffered mild to moderate functional limitations on the "B" criteria by reason of her Depressive disorder. (R. 205, 209-10).  By his mental RFC, Plaintiff could do still concentrated task oriented activities.  (R. 211).  In April 2002, Dr. Nancy Dinwoodie, M.D., another reviewing doctor, completed a mental RFC and a PRT form which likewise found Plaintiff suffering only mild to moderate functional limitations by reason of her depression and anxiety.  (R. 227-43). None of these assessments indicated a disabling mental condition.

45.[4]  Her treatment recommendations were for individualized therapy and psychiatric

evaluation.  (R. 340-49).  Thereafter, on August 14, 2003, Plaintiff agreed to such a treatment

plan.  (R. 336-39).  On August 27, 2003, Plaintiff was evaluated by Dr. Mukherjea, a

psychiatrist.  By his evaluation, Plaintiff presented with "low energy, crying, feeling hurt, and

negative self-image."  (R. 333).  On mental status exam, he found Plaintiff alert and well

oriented, anxious, with a depressed mood and limited insight into her problem, but with

adequate judgment.  (R. 334).  By his diagnostic impression, Plaintiff suffered major

depressive disorder.  He, too, assessed the Plaintiff with a GAF score of 45.  (R. 335).

Additionally, the records from Mental Health Care, Inc., revealed two brief progress notes

from a clinical social worker.  (R. 330-32).  As noted below, although there were two

additional reports from Dr. Mukherjea available prior to the decision, they were not made

available to the ALJ.

Under the regulations, a treating source is a doctor or psychologist who has provided

a claimant with medical treatment or evaluation and who has or has had an ongoing treatment

relationship with the claimant.  See 20 C.F.R. § 416.902.  An ongoing treatment relationship

will be found  when the medical evidence establishes that the claimant sees or has seen the

doctor or psychologist with a frequency consistent with accepted medical practice for the type

of treatment and evaluation required for the claimant's condition.  Id.

---

[4]GAF is a standard measurement of an individual's overall functioning level "with
respect only to psychological, social, and occupational functioning."  AMERICAN
PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL
DISORDERS at 32 (4th ed. 1994) (DSM-IV).  A GAF of 41-50 indicates either "serious
symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any
serious impairment in social, occupational, or school functioning (e.g., no friends, unable to
keep a job).  Id.

On the basis of the records made available to the ALJ, he did not err in concluding that Dr. Gardner was not a treating doctor.  There was simply no evidence before the ALJ (or otherwise) that Dr. Gardner had an ongoing treatment relationship with the Plaintiff.  As for Dr. Mukherjea, it is a closer issue.  Plaintiff testified at the second hearing that she was seeing this doctor on a monthly basis and it is now apparent that Plaintiff saw this doctor in a treatment relationship for at least several months after August 2003.  At the date of the decision, however, this was not well revealed by the medical records before the ALJ.  Rather inexplicably, counsel did not submit Dr. Mukherjea's October and November 2003 notes until after the ALJ's decision was rendered.  In these circumstances, it is difficult to now fault the ALJ's conclusion that Dr. Mukherjea did not *yet* have a treating relationship with the Plaintiff when such was not clearly revealed by the record and the ALJ was deprived of pertinent records.[5]  However, after consideration, I conclude that even if the ALJ erred in misidentifying this doctor as a treating doctor, the doctor's reports before the ALJ did not dictate a different result.  And, more particularly to the Plaintiff's argument, there is no showing that the opinions of Dr. Linder were inconsistent with those of Dr. Mukherjea or otherwise not supported by the medical record as a whole.

My reading of the decision is that the ALJ relied on Dr. Linder's opinions to interpret the medical record.  Regarding the mental health record, Dr. Linder conceded it was not his area of expertise and thus he did not render separate opinions regarding the Plaintiff's diagnosis or limitations apart from what the doctors themselves noted.  He did opine that the

---

[5]In November, Plaintiff reported her medication was helpful, but she was still depressed.  On both occasions, the doctor gave a GAF score of 45 but no further explanation.  See (R. 355-56).

mental health records did not reflect a significant change in Plaintiff's psychiatric symptoms from the time that Dr. Dinwoodie first assessed her condition.  In giving this opinion, rather than rendering an opinion contrary to either Dr. Gardner or Dr. Mukherjea, Dr. Linder appears to have relied directly on their records.  By his conclusion, these records reflected that Plaintiff, despite her stress, was effectively managing, on a daily basis, the care for an autistic child, a dependent husband and mother.  By his review of these records, while Plaintiff was understandably anxious and depressed about her life, she had not withdrawn but instead was meeting the challenges head on.  He did opine that she was not markedly withdrawn in activities of daily living, or social activities, but this was not contrary to the opinion of any examining doctor.  Thus, I cannot conclude that Plaintiff demonstrates this error on the part of the ALJ.  By my review of the doctors' notes, Dr. Linder's conclusions are reflective of, and supported by, what the examining doctors reported.

Ultimately, the ALJ's assessment as to the functional impact of Plaintiff's anxiety/depression was the same as Dr. Dinwoodie's.[6]  While Dinwoodie was a nonexamining doctor and thus, in principle, her opinion was entitled to less weight, there were no contrary functional assessments by any examining doctors.  Plaintiff is correct that under the applicable standard, the opinions of nonexamining doctors are entitled to little weight where they conflict with the opinions of examining doctors, and, standing alone, do not constitute substantial evidence.  Lamb v. Bowen, 874 F.2d 698, 703 (11th Cir. 1988).  But that is not demonstrated to be the case here, and when the record is considered as a whole, as I

---

[6]By Dr. Dinwoodie's assessment, Plaintiff was mentally capable of performing simple repetitive tasks for a full day and a full week.  By her assessment, Plaintiff suffered only mild to moderate functional limitations in the "B" criteria of the listing 12.04 except for episodes of decompensation where Plaintiff had "none."  (R. 237).

conclude it was, the ALJ decision comports with the applicable standards and his conclusion

that Plaintiff suffered only mild to moderate limitations by reason of her anxiety/depression is

supported by substantial evidence.[7]

By her second claim, Plaintiff complains that the ALJ erred in failing to fully credit

her testimony.  More particularly, Plaintiff again complains the ALJ failed to adequately

credit and integrate the findings and opinions of the mental health doctors, and she argues that

he incorrectly gave little weight to her subjective testimony because he concluded she had

only recently begun treatment and in light of her level of daily activity.  Plaintiff urges that

because of the ALJ's failures to articulate adequate reasons for discrediting her subjective

testimony, it must be accepted as proof under the applicable standard.  In these circumstances,

Plaintiff seeks an order reversing the decision and directing the award of benefits.

In this circuit, subjective complaints such as pain, fatigue or dizziness are governed

by a three-part "pain standard" that applies when a claimant attempts to establish disability

---

[7]Apart from the implications that arise from a GAF score of 45, the reports of Drs. Gardner and Mukherjea do not reveal findings of severe or marked functional limitations indicating disability.  While such a score cannot be ignored, the mere assessment of a low GAF score does not require a finding of disability.  Seymore v. Apfel, 131 F.3d 152, at *2 (10th Cir. 1997) (unpublished table decision) ("Contrary to claimant's contention, a GAF rating of 45 may indicate problems that do not necessarily relate to the ability to hold a job; thus, standing alone without further narrative explanation, the rating of 45 does not evidence an impairment seriously interfering with claimant's ability to work"); accord Cox v. Apfel, No. 99-2296-JWL, 2000 WL 1472729, at *9 (D. Kan. Feb. 24, 2000).  In my view, GAF scores reflect a subjective "snapshot" of a person's current mental condition.  But, in general, it unclear what standards are applied by mental health providers who use such scoring, and here it is unclear how these doctors arrived at that rating given the level of functioning Plaintiff was maintaining on a daily basis.  In any event, Dr. Linder declined to venture an opinion, contrary or otherwise, on Plaintiff's GAF.  In light of the level of functioning that Plaintiff indicated she was daily performing on her own behalf and that of her son, husband, and mother, the score reveals little concerning Plaintiff's ability to hold fulltime employment at the level ultimately assessed by the ALJ.

through subjective symptoms.  By this standard, there must be evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged symptom arising from the condition or evidence that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain.  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986)).  A claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability.  Id.; Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).  If the ALJ determines not to credit subjective testimony, he must articulate explicit and adequate reasons for his decision.  The failure of an ALJ to do so requires, as a matter of law, that the testimony be accepted as true.  MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).  However, a reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  Hale, 831 F.2d at 1012.

Initially, I find that the decision, citing as it does 20 C.F.R. § 416.929, SSR 96-7p, and Landry v. Heckler, clearly reflects a fair understanding on the part of the ALJ as to his obligations and the applicable standards for assessing the Plaintiff's subjective complaints. (R. 20).  To the extent that Plaintiff urges that ALJ did not squarely confront the credibility issue under the applicable standard, she is incorrect.  The issue which merits further discussion is whether the ALJ was obliged on this record to fully credit Plaintiff's subjective complaints and if not, whether he adequately explained his reasons for discounting such evidence.

As a starting point, it must be recognized that the ALJ credited the Plaintiff with both physical and mental limitations pertinent to the decision on disability.  However, he

rejected Plaintiff's claim that the limitations were so great as to prevent her from performing all work.  On this point, Plaintiff urges again the contention that the reports of Drs. Gardner and Mukherjea require a conclusion of a mentally disabling condition.  Once again, I disagree.  Reviewing the mental health record as a whole, the ALJ concluded that, at most, Plaintiff suffered mild to moderate functional limitations only.  As noted above, I find this conclusion supported by substantial evidence.

In discounting the Plaintiff's allegations that physical impairments left her disabled, the ALJ relied upon the objective medical evidence and general lack of support for her claims of a disabling physical condition.[8]  Id.  In discounting her testimony concerning anxiety and depression, as Plaintiff suggests, the ALJ did cite to her lack of treatment history and her daily activities.  However, it is also clear that he relied on the mental health record and a lack evidence that the condition had substantially changed over time.  Additionally, the ALJ noted her self report in July 2001, at the time of the alleged onset of her disability, that she was planning her son's wedding, working and attending nursing school.  He also cited to her report in September 2002, indicating that she had been symptom free while on vacation in Virginia.  After thorough review, I conclude that, taken as a whole, these reasons are both supported by the record and sufficient to support a conclusion that Plaintiff's mental functional limitations did not render her incapable of performing unskilled work on a fulltime basis, as identified by the VE.

---

[8]Plaintiff does not appear to challenge the findings or conclusions concerning her physical capacity for work or the ALJ's discounting of her subjective testimony in that regards.

Here, there are no mental RFCs or other findings rendered by any doctor assessing more than mild difficulties in maintaining social functioning, mild restrictions in daily activities, and moderate difficulties in maintaining concentration, persistence and pace. While I recognize that the Eleventh Circuit has stated that participation in everyday activities of short duration, such as housework, or fishing does not disqualify individuals from disability, see Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997), here the Plaintiff's self described daily routine revealed far more about her functional abilities, her endurance, and her ability to work fulltime at some job.  Thus, I find the reliance of the ALJ on Plaintiff's daily routine in this instance was not inappropriate and her capacity to act as a full-time caretaker for her child and husband, and part-time caretaker for her mother did support the conclusion reached by the ALJ.  Additionally, as noted by the ALJ, the medical record from July 2001 did reflect that Plaintiff had reported to Dr. Jamison, M.D., that she was under slightly increased stress, she was planning for her son's wedding and anticipating some grandchildren, and she was a nursing school student and currently working.  See (R. 132).  As this is the time frame in which Plaintiff claims she became disabled, the ALJ could also rely on such self report in deciding how far to credit the Plaintiff's subjective complaints.  As for her report in September 2002 indicating that she had been symptom free while on vacation in Virginia, although taken from the medical record (R. 270), when considered in context, it appears to me to have little bearing on the Plaintiff's credibility concerning her mental state. Nevertheless, taken as a whole, the ALJ has stated adequate reasons for discounting the Plaintiff's subjective complaints.  See Allen v. Sullivan, 880 F2d. 1200, 1203 (11th Cir. 1989).

16

IV.

While I am entirely sympathetic to the Plaintiff's situation and do not intend to question her difficult circumstances, for the foregoing reasons, the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is otherwise supported by substantial evidence. The decision is affirmed. Accordingly, the Clerk is directed to enter Judgment in favor of the Defendant and to close the file.

**Done and Ordered** at Tampa, Florida, this 13th day of September 2005.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record

17